May it please the Court, good morning. My name is William Wilder. I represent the International Brotherhood of Teamsters Airline Division in this matter. Your Honour, at this time I'd like to reserve four minutes for purposes of rebuttal. Thank you, Your Honour. The union is on appeal from the district court's denial of its request for a preliminary injunction under Section 2 First of the Railway Labor Act against North American's unilateral alteration of rates of pay and other working conditions of its pilots during the course of the party's bargaining and under mediation and terms which were the subject of their major dispute under the Act. Could I just ask you preliminarily, it seems like this matter was on the verge of becoming moot and I know we asked for supplemental briefing. Could you just tell us briefly what the current status is of the negotiations? Your Honour, there was a TA reached by the parties in August of 2007. It was submitted for ratification by the crew members. It was unfortunately rejected and so the parties have rescheduled bargaining but that can't Mr. Wilder, you've requested the services of the Federal Mediation Board, have you not, to assist in future negotiations? Your Honour, yes. They were requested in December of 2005 prior to the changes in this instance and the board has continued its services. So the board has basic, I don't know what the terminology is, but the board has basically initiated its mediation services to assist the parties in reaching an agreement. Yes, Your Honour, it offered its services and that jurisdiction of the board under Section 5 First continues until the board deems the mediatory services have exhausted themselves. So the terminology is the board has basically asserted its jurisdiction in this matter? Yes, Your Honour, in this instance it was requested and the board tendered its services based on a finding that its jurisdiction applied. Okay, now to follow up on my sister's question, if that is the case, as I read the various provisions of the Railway Labor Act, because the board has now asserted its jurisdiction, aren't the parties, in this case the employer, forbidden from making any changes in the status quo because the board is involved? Yes, Your Honour, I think that is the correct reading of Section 2 First and also Section 6 of the Act, which Section 6 is written, its status quo provision is written in the disjunctive and as the Supreme Court noted in Shoreline, the status quo attaches at each of those proceedings of the dispute as that particular stage is invoked by the parties. So if that is the case, why is it not moot if your appeal is from the denial of injunctive relief where the Act clearly provides that once the board has asserted jurisdiction and is working with the parties to reach the agreement, that no changes in the status quo can be made? Well, Your Honour, the board had asserted its jurisdiction prior to the changes being effected and at the time the district court rendered its ruling, I at least understood the district court's ruling to mean that it did not consider the fact that the mediation board had tendered its services. No, no, I understand all that, but I'm still trying to pursue Judge Okuda's question because I have the same concern. It may not be technically moot, but to the extent that the union is seeking injunctive relief here in order to guarantee that the employer will not make changes in the status quo while the parties negotiate, you now have the jurisdiction of the mediation board and without regard to the legal issue that you presented to us for resolution regarding pre-collective bargaining agreement status quo changes, the statute clearly says that the change cannot be made once the board has asserted jurisdiction, does it not? Yes, Your Honour, I agree with that. I don't believe that the carrier agrees. I think the carrier takes the opposite position on that, right? Yes, Your Honour. Because in fact, this case, the mediation board had been, if I understand the timeline correctly, and I hope you'll correct me if I'm wrong, the matter had been submitted to the mediation board before the unilateral changes were made, is that true? Yes, Judge Thomas, that's correct. Can you, okay. The claim under that section, section 6 or section 5, isn't before us, right? The original complaint was only, or what's on appeal now is only the section 2 first issue. Yes, Your Honour, the claim is made under section 2 first. To the extent that we have commented upon section 6 and the other status quo provisions of the act, it is because at least in my view, in light of the Supreme Court's description of the status quo in the Shoreline case, that 2 first is part of an understatus quo from the beginning of the dispute to the end, and therefore, and I think the case law is clear that 2 first applies at all stages of a major dispute. But getting back to Judge Thomas' question, as I understand what you're saying, the reason the case isn't moved, even though arguably section 5, 6 might be interpreted, or your interpretation is that it would prevent the carrier from making changes, that very interpretation is not, is in dispute. Is that correct? Yes, Your Honour, that's correct. But let me follow up on that. If we were to hold that the initiation of a mediation process means that you must preserve the status quo, then as a matter of law, because I know you disagree, but that's clear as well. If the court were to hold that under section 6, since the mediatory functions are in place, the status quo applies, well, I would refer the court to its decision in ALPA versus Transamerica, in which ALPA had brought a 2 first claim only. The court found, in fact, that section 6 was a basis for relief and noted that if a litigant can establish any basis for the court to grant relief, the court may do so, even if it is not, in fact, pled in the complaint. And so I would say that the court in that instance could grant, could hold that the injunctive relief would be appropriate under section 6 in view of the carrier's, the fact that the carrier does not agree it is constrained. Obviously, if the carrier agreed, section 6 constrained it in mediation, I think the issue of mootness would be very much a present one. We could certainly explore this with really a practical question. You sought injunctive relief under section 2 first. If section 6 clearly applies, because the services of the board have been invoked, what need do you have of a declaration from us as to the legal effect of section 2 first when you're fully protected under section 6 from changes in the status quo? And why is it an abuse of discretion for Judge Henderson to deny a preliminary injunction for that reason? I don't think that Judge Henderson, in fact, denied the motion for a preliminary injunction on the basis that section 6 protected the employee's interest in the status quo provisions of the act. We can uphold the determination by the district court on any grounds supported by the record. And the record, it seems to me, does clearly tell us that section 6 now applies. And I'm having a hard time declaring that it would be an abuse of discretion, given that fact, to reverse the remand and send it back to Judge Henderson and tell him now enter an injunction. Well, Your Honor, I think if the court, in fact, held that section 6 did mandate adherence to the status quo while the parties are in mediation, which I agree is the plain reading of the statute, that that would be the effect of saying, at this point in the process, this particular status quo provision applies of the total scheme, and that would be the effect of relief, which would not require decision on the 2 first issue by the court. But let me turn directly to the 2 first issue. In the union's view, the company's action, which was to alter terms and conditions which are the subject of the major dispute, in fact, is violative of section 2 first and of necessity obstructs and undermines the bargaining process in an objective manner, even apart from a finding of subjective bad faith. If you consider section 2 first, there is obviously in that provision no distinction made between major disputes involving changes to agreements and major disputes involving formation of agreements, and in fact, from the beginning of the Railway Labor Act, as noted by the Supreme Court in the Burley case, major disputes involved the formation or the attempt to secure a collective bargaining agreement as well as alteration for those of those agreements. So major disputes contemplate both, and the Act does not distinguish between the two. In fact, its fourth general purpose stated in section 1A of the Act is to provide for the resolution of all disputes concerning rates of pay, rules, and working conditions, again, making no distinction between types of disputes concerning rates of pay, rules, and working conditions. Mr. Wilder, if we so rule, do we not have to declare that Williams v. Jacksonville Terminal is a dead letter? No, Your Honor. I think Williams should simply be limited to the facts that were in place in that decision. The Williams case involved changes by the carrier in the accounting of its employees' wages, red caps in that instance, for purposes of the Fair Labor Standards Act. In other words, it reordered the wage relationship with its employees in response to a federal mandate. But there's nothing in the record of Williams to indicate that, in fact, the carrier made a change in conditions as that would be contemplated by the Railway Labor Act, meaning there's nothing in Williams to indicate the red caps made any less following the change in the accounting system than prior to it. And, in fact, what the Supreme Court observed is they were attempting to use Section 2 First to require the company to both pay them the minimum wage required by FLSA and allow them to keep their tips for themselves without credit towards the minimum wage. But that's an issue of that carrier's obligations under the FLSA, not the Railway Labor Act. And, in fact, what the Court held was Section 2 First did not constrain the carrier in altering its employment relationship with its employees as reflected in this record, meaning in response to the mandates of the Fair Labor Standards Act. But in this instance, we do not have carrier unilateral action or reordering of employment relationship based on a response to a federal mandate. This is more like Shoreline, where a carrier privately makes a judgment regarding its business interests and, therefore, attempts to reorder the conditions of its employment with its employees in accordance with its private determination of what its interests are. And, in that instance, of course, the Supreme Court in Shoreline held that violates the status quo. But I would submit Williams should be constrained to its rights. But isn't the real similarity between Williams and this case the fact that we're dealing with wages and hours of work? I mean, you could say that Williams is more closely analogous to this case for that reason because it involves money and it involves, you know, how many hours the pilots are permitted to work and what kind of overtime they're going to get. I mean, you could call this a Fair Labor Standards Act case as well, I think, couldn't you? Well, the FLSA doesn't apply, for example, for overtime purposes in the Railway Labor Act. But I really don't think so because, again, Williams did not involve a substantive change in the amount paid to its employees. Well, it involved how you credited the tips and whether or not that then triggered an obligation on the part of the employer to do certain things, did it not? But under the FLSA, not the Railway Labor Act, Your Honor. And, in fact, prior to the implementation of the FLSA. The Shoreline case dealt with where you report for duty, right? Do you have to go up the line 35 miles and are you going to get paid for travel time and all that sort of thing? Yes, Your Honor. But the act does not distinguish between, for example, disputes over rates of pay or disputes over working conditions. It intends to capture all major disputes governing those types of employment, employer-employee relations. And, in fact, in Williams, prior to the implementation of the FLSA, all the compensation the red caps received was their tips. They didn't receive separate wages from their employer. So, again, I would submit that Williams should be narrowed to its facts. In addition to the observation that's made, for example, in the 11th Circuit Tampa case that it involved no history of bargaining, it should also be restricted to its facts in that it didn't, in fact, involve the issue of compliance with the FLSA, not the RLA. And I would also point out that to the extent the Supreme Court in Williams constrained the application of the status quo to whether or not there is an attempt to change terms of agreements because of the language of 2-7th, the Supreme Court in Shoreline later specifically rejected an effort to so constrain the application of the status quo based on 2-7th and found that 2-7th has no relation to the status quo provisions of the act and, in fact, simply states the elements of a criminal offense under Section 2-10th. So I think there are, as courts of appeal have noted, considerable grounds to question the continued validity of Williams. Your argument, and I'm looking at 315 U.S. at 403, where they talk about Section 2-7th, where they say, are aimed at preventing changes in conditions previously fixed by collective bargaining agreements. Your argument is that that language, although appearing to be broad, is restricted solely to Section 2-7th? Your Honor, the Court, as I read Williams, I think its introductory comments to that are based on the prohibitions of Section 6 against changes of wages or conditions pending bargaining and those of 2-7th are aimed at preventing changes in conditions previously fixed by collective bargaining agreements. As I noted, 2-7th is not a part of the status quo provisions of the act and, in fact, Section 6, the status quo provision, in no way constrains the status quo to the terms of agreements, which is exactly what the Supreme Court found in Shoreline. So you don't read that as broadly stating that it only applies to previously negotiated collective bargaining agreements? I think the Court may well have been seeking that conclusion, but it's in light of its reading of Section 6 and 2-7th, and both of those conclusions, I think, contradict Shoreline, certainly as to 2-7th being part of the status quo, but even that assertion by the Supreme Court, established by the agreement of the parties, I think Shoreline disagreed with that, clearly. Your argument, though, sounds to me like you're asking us to basically declare that Williams is no longer good law because it's been overruled by Shoreline or superseded. Do we have that authority as a court of appeals? Your Honor, I don't think this Court need do more than what other courts of appeals have noted, which is that Williams is weakened, its continued validity is in question, and in light of the particular facts of Williams, that it should be read narrowly to be constrained in those facts, as opposed to a case, the present case, which is before the Court, which involved bargaining, mediation, and terms that are under, that are the subject of the major dispute. And in that instance, I would submit that the analogy to the NLRB versus Katz is very apt because Katz dealt with that question of unilateral changes to conditions which are mandatory subjects of bargaining and under negotiation by the parties. And there's nothing in 2 First to indicate that it is any less offended by that type of action than is Section 8A5 of the NLRA, and in fact, the implicit status quo that is in 2 First would suggest that it is, puts more emphasis on refraining from unilateral action and engaging in bargaining than even Section 8A5 does. Your Honor, I think we're a little under three minutes left. Do you want to reserve? Your Honor, I will stop now in order to reserve some time. Thank you. Thank you, Counsel. Good morning, Your Honors. I'm Norman Quant. I represent North American Airlines in this litigation, and thank you for having me here in California. Let me address mootness issue. We are in absolute agreement with the IBT that the case is not moot. In fact, the request came to the Court when I was scuba diving in Sabah, and we had asked for an extension, but we got a quick letter out saying we do not think it's moot. There's money involved in this case, Your Honors. The company did, in fact, unilaterally cut wages of the pilot group for about a 10-month period. There were business reasons for doing it. It was done on a nondiscriminatory basis. Yes, but do you agree that now that the services of the Mediation Board have been invoked that you cannot make changes in this case? We absolutely do not agree with that, Your Honor. The NMB's role has nothing to do with this issue. The issue in front of the Court is the Williams issue. Everybody agrees, all the court cases out there. Before you get into that, sir, I mean, your position is that once the Board gets involved, you may make unilateral changes? Prior to the first contract, yes, sir. When we look at the language in Section 6, and again, there is specific language in there that indicates when the services of the Mediation Board have been requested by either party that the status quo provision would kick in. Yes. Why don't we just give effect to the plain language there? Read the language. There's a quote right out of the Williams case, quotes the two provisions in Section 2-7 and Section 6, and it's clearly tied to maintaining the status quo if you have an agreement. It's clearly tied to that, and the U.S. Supreme Court in the Williams case pointed out that in 1934, the language was changed to add that language. They added Section 2-7 to 1934, and they added the language in Section 6 that refers to pursuant to the agreement, under the agreement, clearly the intent of Congress to clarify that the status quo only applied once an agreement was in effect. During the first contract negotiations, which are going on right now with North Americans, since the tentative was rejected, during first contract negotiations, there is no status quo. That's our position. That's the Williams court's position. The difference between this case and Williams, the only difference that exists out there, is here the change was made while negotiations were going on. In the Williams case, the changes were made prior to the commencement of negotiations. There are a half-dozen cases out there all cited in the briefs. The Williams case, the Wings West case, the Ninth Circuit, the ACA case, the IMVTWA case, all of these are, all these cases hold that the status quo does not apply before you start negotiations for the first contract. All of those cases clearly say that. The IBT would not dispute that. Our experience is... But here you've commenced negotiations, and you're in mediation. Yes, sir. We are in both. And you have reached a tentative agreement, but that's been voted out. Tentative was rejected, so we do not have a contract. So that's, and that is what the agreement holds, that during the first contract negotiations, you don't have a status quo. There's all kinds of policy reasons for it, but it's primarily a matter of statutory interpretation. That is the way the language of the Railway Labor Act is worded, okay? And that's our position that should be maintained. So you would disagree with the Eleventh Circuit, obviously, right? That's the one case that goes the other way. That's the Tampa Airlines case that goes the other way. You would agree with the Second Circuit? Second Circuit. Even, even though it's just a tentative agreement? The second ACA, ACA AMFA case in the Second Circuit is on all fours with this case. Absolutely on all fours. What's the principal difference between having a tentative agreement and invoking the Mediation Board? Well, normally the way it works... The theory of all this is that once you, once you've started in the process, you've initiated some settlement, either by a tentative agreement or otherwise, that you need some power to, that you need some power to enforce the status quo. It seems to me, with the underlying purpose of the Act, that once you, there, there's another point at which you might draw the line, and that is once you've submitted this to the Mediation Board, that maybe the status quo provisions ought to kick in. Well, it's not, nobody has said that at this point, Your Honor. I'm just talking about the theory of the, I'm talking about the theory of the Act. I mean, to explain the role of the NMB, they can be brought in at any time on the request of either party. Right. They can be brought in day one of negotiations on request of the parties. They might agree to come in. They might not agree to come in. They can also come in sua sponte. They have no arbitral authority. They are simply mediators, what they do. They dictate the pace of the negotiations. That's the role of the government. The reason that the contracts take so long to negotiate under the Railway Labor Act is because the government dictates the pace, and if the government feels like one party is being completely unreasonable, they'll put them in the cooler, and you go months and months, perhaps six months, maybe a year, without even having meetings. The government makes that determination. It has nothing to do with a tentative agreement. The government could come in well before a tentative agreement. They could come in after a tentative agreement fails. It's at the choice of the parties or at the choice of the government. They can do it either way. But isn't the purpose of maintaining the status quo to give teeth to the role of the mediation board so that it keeps the parties at the bargaining table so that the mediators can work their magic? Yes. And we have no dispute that once you have an agreement in place, you cannot change the status quo. That's absolutely the case. No, but I mean, we're talking about when mediation has been initiated, I think. Mediation for initial contract, there's nothing in the statute. The statutory language does not support the idea that the status quo attaches at that first stage, before the first contract is negotiated. That's the whole key to this case. And if you accept the fact that the courts have repeatedly found, including the Ninth Amendment, that the status quo does not apply before the commencement of negotiations, there's really no analytical reason why it would apply after you've started negotiations, but if not, in fact, negotiate your first contract. Although I think there's a difference analytically in this respect, is that once the parties have commenced the process, I think there is some public policy interest in saying we want to ensure the integrity of the process all the way through and prevent each party, particularly in this context of national transportation, from taking a position that would, unilaterally, that would alter the course of negotiations. I mean, that's the policy. If you haven't started it, it doesn't make any difference. It's not as though the unions are left without a remedy here. In fact, if the company engages in any kind of sort of bad faith bargaining, dilatory tactics, things like that, a two-first claim can be filed under very limited circumstances, but there is a remedy available to the unions.     but there is a remedy available to the unions. before, is that our approach, William's case, interprets delay tactics on the part of the company in first contract. It will delay getting that first contract. If anything, I think it's exactly the opposite if you think about it, because if everything is, in fact, frozen, which is the IVT's theory in this case, the employer would have an incentive to delay the process as long as possible, because at the end of the road, there's going to be probably a pay increase coming down the pike. That's the typical pattern in negotiations. Now, there are obviously other patterns during the concessionary period. That isn't true. But in the normal period of negotiation, when you finish negotiations, there's going to be a pay increase coming down the pike. Under the IVT's theory, the company would just delay it as long as they possibly could. And in fact, Like you say, that depends on the general economic conditions. I mean, if your fuel costs are going out of sight and the company's getting squeezed, there may be a pay cut coming at the end of the period. Right. And that's absolutely true. And that does happen. You know, that's absolutely been the pattern over the last couple of years. We all know that. But the policy cuts both ways, is what I'm saying. And this is really, though, again, it's a matter of the statute, the way the statute is written, the way the Railway Labor Act is written. It contemplates the status quo attaches at the point that you have a first contract and not before. Why does it, if we adopt your interpretation, why does the Second Circuit theory make any sense? I mean, if you don't, if you had a tentative agreement, you don't have a final agreement. Why does it make any sense, under your theory, to draw the line at the point where you have a tentative agreement? Actually, the 11th Circuit did that. That was an 11th Circuit decision, the Tampa case. They said that... They distinguished... The Second Circuit distinguished it on that. They said, well, a tentative... They said, well, a tentative agreement was in place. Judge Henderson said, in our case, said that our case was much more like the ACA case, the Second Circuit case, than it was the Tampa case, the 11th Circuit case. And in fact, ironically, our case would resemble the Tampa case more now than it did at the time this case was tried, because there was a rejected tentative, which is exactly what happened in the Tampa case. So if the company went out now, North America had made cuts, and the record shows, it really wasn't in the record, but it's on page eight of their brief, that the pay cuts were reinstated in October of 2005. If the company went out now and cut pay after the tentative has been rejected, the case would be a lot closer factually to the Tampa case than it would be to the ACA case. Well, actually, what I meant to say was that it's the Second Circuit's interpretation of what the 11th Circuit was doing. The 11th Circuit itself didn't make that distinction, I don't think. It was a factual distinction that the Second Circuit drew. That's correct. And the Wings West case did the same thing. The sequence is, again, Wings West is the first case after the Supreme Court Williams case. Then you have the Tampa case. And then you have the ACA case is the most recent of the sequence. I think the argument about the NLRA law, and judges tend to be much more familiar by and large with the NLRA than the RLA, they're totally different. There's all these cases out there that say you have to draw comparisons carefully because there are major differences between the purposes and the wordings of the two statutes. The whole major dispute resolution mechanism under the RLA is fundamentally different than the NLRA. The NLRA unions can strike day one after they get voted in. They have that kind of power. RLA, that cannot happen. The major dispute, make a contract dispute resolution mechanism is one of drawn out negotiations and they can take a long time and the parties will come to their senses over time. So there's a fundamental difference. And the Ninth Circuit in the Wings West case specifically rejected the applicability of the CATS case, which is the lead NLRA case in this area. There's no question that the employer could not do this under the NLRA. Under the RLA, under the Williams case, it seems pretty clear from the statute. And Judge Henderson analyzed it beautifully, the decision is very lucid. You can do it until that first contract is negotiated. Here's the key language. It's on page 403 of Williams. Arrangements made after collective bargaining, after collective bargaining, obviously are and higher degree of permanency and continuity than those made by the carrier for its own convenience and purposes. So the policy is to recognize once you have a contract in place, there's a higher degree of deference owed. The status quo applies. It doesn't apply until that point. The other language I just quote from the Williams case is where the court says institution of negotiations, which is really initiation of negotiations for collective bargaining, does not change the authority of the carrier to arrange its business relations with its employees. And why is it set up that way? Again, it could be in part a recognition by Congress that since the process is going to take so long, it's not right, it doesn't make sense to restrict the employer for the two, three, four years that it frequently takes to negotiate a first contract. Maybe that's what Congress had in mind, but that's the way they worded the Railway Labor Act. I think we have your argument at hand, unless there are further questions. Thank you, Your Honor. I think the point made by Judge Thomas is appropriate regarding the interest of the court and the interest of the public in this area. The Supreme Court in the Virginia Railway case, which is a very early Railway Labor Act case, noted that the peaceable settlement of labor disputes under the RLA are very much a matter of public concern, and the fact that Congress has indicated its purpose to make negotiation obligatory is in itself a declaration of public interest and policy which should be persuasive in inducing courts to give relief, and that was under Section 2 of the Act. And I would point out that the status quo isn't there solely to vindicate the private interest of the parties. It is the central underpinning, central to the Act as the Court described it in Shoreline, of the public interest in delaying unilateral action pending bargaining in order to affect the goal of an agreement without interruption to interstate commerce. So the status quo is as much concerned with the public interest in preventing disruptions of interstate commerce as it is in the private interest of the employees, for example, to You do agree with your opposing counsel, do you not, though, that the NLRA and the RLA are very different in their approaches to the question? Yes, Your Honor, I don't disagree that they have different structures, and the courts have cautioned that you need to be aware of that in analogizing the two. The point I would make is, one, no court has ever held that 2 First has a lesser, a less stringent burden to bargaining good faith than Section 885 does. And secondly, in fact, the description that my colleague gave of the Act demonstrates that the RLA places a greater emphasis on refraining from unilateral self-help and instead pursuing bargaining. That's the other way, in your favor, right? Yes, Your Honor, and in fact, that's the goal of the RLA in contrast to the NLRA. The NLRA gives greater room for private economic action than does the RLA. And I would also point out from the standpoint of Congress, first of all, the change to the notice provision of Section 6 was described by Mr. Clemens, the railroad spokesman, as simply being for clarity and definition. He did not ascribe in 1934 any substantive weight to it. But the interest of changing terms, the need of one party to change terms quickly, the court said in Shoreline that the status quo harnesses that interest for its purpose of achieving agreements without interruption in interstate commerce. So that very interest that the carrier has quoted here about antiquated terms is what the status quo intends to harness to achieve the act's purpose of agreement without interruption of interstate commerce. Thank you, Your Honor. I see my time is up. Thank you, Counselor. The case just heard will be submitted.
judges: Thomas, Tallman, Ikuta